ZUKERMAN GORE & BRANDEIS, LLP
John K. Crossman (JC 7387)
875 Third Avenue
New York, New York 10022
(212) 223-6700

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
BROADWAY REAL ESTATE PARTNERS,    :  Civil Action No.
LLC,                             :
                                 :
            Plaintiff,           :   **05 CV    8751**
                                 :   COMPLAINT
    - against -                  :
                                 :
DEAN BRITTON and STEVEN H. KLEIN, :
                                 :
            Defendants.          :
------------------------------------------------------- X

Plaintiff Broadway Real Estate Partners, LLC, ("Broadway") through its attorneys
Zukerman Gore & Brandeis LLP, for its Complaint against defendants Dean Britton and Steven
H. Klein states as follows:

1.    Defendants are former employees of Broadway who, following two years of
disappointing performance and failure to meet Broadway's expectations, revealed that they had
decided to orchestrate their departures from Broadway – timed at a particularly crucial period of
investor solicitation – for the purposes of forming their own, competing firm. Not only did this
plan to start a competing venture account for at least some of their failure to perform at
Broadway, but following their departure, they have not only violated their former noncompete
agreements, but they have also, it is believed, misrepresented their responsibility for Broadway's
success in an attempt to lure potential investors to their competing venture. Yet, they have
repeatedly made demands (including through lawsuits, later withdrawn) upon Broadway for

compensation to which they are not entitled. Broadway brings this action for the purpose of

having the court finally adjudicate and declare the rights of the parties involved and to protect its

goodwill, reputation and proprietary information from further harm at the hands of defendants.

## PARTIES

2.      Broadway Real Estate Partners, LLC is a Delaware limited liability company, the

principal office of which is in New York City. Broadway's primary business is real estate

investment.

3.      Broadway has two members: Scott Lawlor and RiverOak Investment Corp., LLC.

4.      Scott Lawlor is a citizen of the State of Connecticut.

5.      RiverOak Investment Corp., LLC ("RiverOak") is a Delaware limited liability

company, all of the members of which are natural persons who are citizens of the State of

Connecticut.

6.      Dean Britton and Steven H. Klein are both citizens of the State of New York.

Both are former employees of Broadway.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this case under 28 U.S.C. § 1332(a)(1), as this is

a civil action between citizens of different States in which the matter in controversy exceeds

$75,000, exclusive of interest and costs. This Court also has jurisdiction over the Lanham Act

claim pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1121, and supplemental jurisdiction over the

remaining claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this district under 28 U.S.C. § 1391(a)(1) because both

defendants reside in this district. Venue is also proper under 28 U.S.C. § 1391(a)(2), in that a

substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND

### *Broadway's Business*

9.     Broadway is a firm specializing in commercial real estate investment. Primarily, these investments take the form of purchases of commercial properties which Broadway then manages and, eventually, sells at a profit.

10.    The purchases are funded by a combination of Broadway's own capital and that solicited from outside investors, as well as debt financing – primarily through mortgages of the purchased property, but also through other vehicles.

11.    Broadway's properties are located in many different states in addition to New York. Broadway's investors likewise come from all over the United States and from abroad as well.

12.    During the time that defendants Klein and Britton were employees, the typical structure of each deal was that each purchase was organized as its own limited partnership, of which Broadway served as general partner and equity investors participated as limited partners.

13.    Upon the sale of a property (or other liquidity event), Broadway is entitled to its "promote," which is a percentage of the profits from a sale after repayment of any debt, a certain return on the limited partners' capital, and return of the limited partners' capital. The "promote" is, in effect, Broadway's management fee. The remaining profit is divided among the limited partners (and Broadway) according to the capital invested.

14.    Broadway changed the structure of its business model significantly during the first half of 2005, moving to a model in which, rather than solicit investors for individual properties, investors are invited to invest their capital in a fund from which Broadway, in its discretion, will draw to purchase new investment properties. As discussed in more detail in

3

Paragraphs 35 - 42, Britton and Klein's departures occurred during this shift in Broadway's business model and, indeed, were timed for maximum disruption of this shift.

15.     Although the purchase of individual properties described above accounts for the large majority of Broadway's business, Broadway also has a subsidiary that manages commercial properties (both those owned by Broadway and others), and it also runs an executive suites business – i.e., commercial space that can be leased out (with some staff and other support) to small business, solo professional practices, and the like. These businesses do not contribute substantially, if at all, to Broadway's profitability.

### *Britton's History with Broadway*

16.     Broadway was originally formed as a Delaware limited liability company in July 1999 by Scott Lawlor and defendant Britton. Its original name was Allegiance Capital Partners LLC. In September 2000, RiverOak was admitted as a member. Lawlor and Britton were the initial managing members of Broadway.

17.     In late 2000, Lawlor grew increasingly dissatisfied with Britton's contributions and decided that it would be best to terminate their venture, and in January 2001 Britton voluntarily withdrew as a member of Allegiance, which simultaneously changed its name to the current Broadway Real Estate Partners, LLC.

18.     With Lawlor now the sole managing member of Broadway, the business grew substantially and its reputation as a successful player in the commercial real estate market was established.

19.     In February 2003, Britton returned to Broadway, being hired as Chief Financial Officer. His role as CFO was to focus on raising equity.

20.     The terms of Britton's employment were formally laid out in an employment agreement dated October 21, 2003 (attached as Exhibit A) (the "Britton Agreement"). This agreement, which superseded the informal arrangements that had existed to that time, provided, among other things, for Britton to be paid a base salary of $125,000 (Britton Agreement ¶ 4), plus a percentage (vested over time up to 15.44%) (the "Interest") of Broadway's net operating earnings (essentially, the promote plus any return on invested capital) from each investment deal (*id.* ¶¶ 5-7). The Interest was subject to adjustment (increase or dilution) as other employees were granted interests in various deals (or as those with interests already left the company). (*Id.* ¶ 8.)

21.     The Britton Agreement also provides that upon his termination or resignation, he and Broadway would enter into a participation agreement with respect to those deals still outstanding (i.e., where the property had not yet been sold). The terms of the participation agreement were to specify that, once these deals were completed, Britton would receive a percentage, called the "Exit Percentage," of Broadway's earnings from that deal out of the promote and capital account. The Exit Percentage is specified in the Britton Agreement as his then-vested Interest, multiplied by the ratio of (1) the period of time Broadway held the investment during Britton's employment with Broadway to (2) the total period of time Broadway held the investment. (*Id.* ¶ 11.)

22.     The Britton Agreement also requires that, for 18 months following its termination, Britton "may not have any contact with any investor in any Company investment, attempt to recruit any Company employee or pursue any investment identified by the Company at the time of the termination." Violation of this noncompete provision "results in forfeiture of the participation agreement." (*Id.* ¶ 12.)

5

23.     Finally, the Britton Agreement also states that "it is the intention of the parties to admit you [Britton] to the Company LLC, based on terms and conditions outlined in the attached, no later than December 31, 2004." (Britton Agreement at 1.)

24.     By the end of 2003, it had become apparent that Britton was having no success at recruiting equity investors for Broadway. Rather, however, than simply part ways again, Lawlor decided that Britton might profitably develop a debt-based investment vehicle (e.g., mezzanine loans) for Broadway. Not only was this an area that Broadway had not previously explored in earnest, but it also seemed a better fit for Britton, whose career experiences had been more focused on debt.

25.     To that end, Lawlor (on behalf of Broadway) and Britton began negotiating Britton's effective exit from the equity side of Broadway's business. That is, the parties began to negotiate a modification to the Britton Agreement whereby Britton would reduce, going forward, his Interest in Broadway's equity deals to 1% in exchange for a relatively sizable interest in any debt-based deals he was successful in formulating.

26.     By August 2004, Broadway and Britton had reached agreement on a modification to the Britton Agreement (the "Modified Britton Agreement"). The key terms of the Modified Britton Agreement were that: (1) Britton would "exit" Broadway's equity deals as of September 2004 under the terms of the original Britton Agreement (i.e., as if, with respect to those deals, the Britton Agreement were terminated), except for a 1% interest going forward; (2) Britton would receive a 40% interest in any new, debt-based deals he led (i.e., 40% of Broadway's net operating earnings from the debt business); and (3) his salary would be increased to $150,000 per year. The noncompete provisions of the original Britton Agreement remained in place. Although Britton and Broadway agreed (orally and through emails) to the Modified Britton

6

Agreement, it was never reduced to a signed writing, but the parties acted in accordance with its terms.

27.    Despite his change in focus, and despite his expenditure of hundreds of thousands of dollars of Broadway's money for this new debt-based program, Britton was completely unsuccessful in developing a debt side to Broadway's business. He consummated not a single deal.

28.    In a letter dated April 18, 2005, Britton tendered his resignation from the company. Still interested in pursuing the debt business, Broadway attempted to negotiate Britton's continued employment with the company. Britton's financial demands were too steep, however, and the parties could not reach agreement on terms under which Britton would agree to stay with the company. Britton left the company on or about April 26, 2005.

29.    Although the Britton Agreement expressed Broadway's future hope, as of October 2003, to make Britton a member of Broadway, this intention was based on an expectation of his production and performance that never materialized. Accordingly, Britton was never given any membership interest in Broadway, nor was he ever made a member.

### *Klein's History with Broadway*

30.    Defendant Klein joined Broadway in October 2002. His title was Chief Investment Officer, and his primary responsibility was to identify new investment opportunities and to oversee acquisition transactions.

31.    Klein's employment arrangement with Broadway was embodied in an employment agreement dated October 24, 2003 (attached as Exhibit B) (the "Klein Agreement"). Its terms are largely identical to the Britton Agreement, except that Klein had a smaller

percentage Interest in individual deals (7.72% vs. 15.44%). (Klein Agreement ¶ 5.) Klein's
noncompete provision is also somewhat narrower in its restrictions than Britton's. (*Id.* ¶ 12.)

32.     Like Britton, Klein's performance at Broadway was disappointing. In his role as
Chief Investment Officer, he was never willing (or, perhaps, able) to produce the detailed level
of analysis of potential properties demanded by Broadway and the institutional investors it
sought.

33.     Despite his poor performance, in or around March/April of 2005, Klein demanded
that he receive significantly higher compensation. Broadway was unwilling to accede to Klein's
exorbitant demands, and he was terminated effective April 4, 2005.

34.     Like Britton, and for the same reasons, Klein was never given any membership
interest in Broadway, nor was he ever made a member.

### *Klein and Britton's Post-Employment Actions*

35.     Beginning in mid 2004, Broadway decided to revamp its mode of soliciting
investors for its properties. Whereas Broadway had previously sought investors for specifically
identified individual properties (setting up a separate investment vehicle, usually a limited
liability company, for each), Broadway determined to solicit investors for investment via a fund
format (the "Funds") from which Broadway would, at its discretion, draw to purchase investment
properties.

36.     Britton and Klein were well aware of this change in strategy and its importance to
Broadway.

37.     Broadway went public with this strategy in September 2004. By March/April of
2005, the Funds were significantly subscribed via verbal expressions of intent, and all that
remained was to formalize and close them.

38.     It was at this particularly critical time that, first, Klein made the unreasonable financial demands (on information and belief, intentionally and unreasonably) that precipitated his termination and then, a couple of weeks later, Britton announced his resignation as well. These actions were timed to create maximum disruption to the closing of the Funds.

39.     In May 2005, after Broadway made known to its investors that Britton and Klein were no longer with the company, the agent of a major potential investor asked if he could talk with them. Broadway contacted Britton and Klein and requested that they speak with the investor, but both refused to do so. As a result, the investor chose to withdraw his investment from the Funds, and Broadway lost approximately $17 million in committed capital which could have been profitably invested.

40.     On June 3, 2005, Klein filed suit against Broadway in New York State Supreme Court (Index No. 602008/05). The complaint alleged that Broadway had breached the Klein Agreement and sought not only damages for the breach but an accounting. The complaint did not allege that Klein was a member of Broadway or assert rights except those allegedly due under the Klein Agreement.

41.     On June 7, 2005, Britton also filed suit against Broadway in New York State Supreme Court (Index No. 602048/05). Britton relied solely upon the Britton Agreement (denying that any modification had been agreed to) and asserted claims for breach of that agreement and for an accounting. (He also alleged, rather incomprehensibly, a claim for fraud, although he did not claim to be the party defrauded.) Also like Klein, Britton never alleged that he was a member of Broadway – indeed, the complaint alleged that Broadway had breached the Britton Agreement by *not* making Britton a member. The Britton complaint also asserted that Broadway had not made Klein a member either.

9

42.   On June 8, the Funds closed.

43.   On June 17, 2005, Klein voluntarily withdrew his complaint.

44.   On or about July 5, 2005, Britton also voluntarily withdrew his complaint.

45.   Following withdrawal of their complaints, negotiations to resolve any outstanding

disputes between Klein, Britton and Broadway were conducted.

46.   On September 14, 2005, Britton and Klein filed a complaint in the Chancery

Court for the State of Delaware (Civil Action No. 1623-N), asserting that they were members of

Broadway and seeking an order allowing them to inspect the books and records of Broadway,

pursuant to Delaware's LLC statute.  The complaint in the Delaware Action also asserts that

there is a dispute between Broadway, on the one hand, and Klein and Britton, on the other hand,

as to whether they are owed monies under their respective employment agreements.

47.   In addition to filing lawsuits against Broadway, Klein and Britton, on information

and belief, have teamed up to form, or are attempting to form, their own competing real estate

investment business.

48.   In pursuit of investors in their new venture, Britton, both for himself and as an

agent of Klein, has spoken to investors in Broadway investments.  Some of these conversations

have been for the purpose of real estate investment.  Accordingly, both Britton and Klein have

breached the noncompete provisions in their respective employment agreements and, under the

terms of those agreements, they are not entitled to any further participation in Broadway or any

share of Broadway's net operating earnings.

49.   In addition, on information and belief, Britton and Klein, in talking with potential

investors, have misrepresented their contribution to Broadway's past success and have unfairly

sought to capitalize upon Broadway's goodwill and reputation in the real estate investment

10

market as their own. Further, by misrepresenting themselves as being responsible for Broadway's past success, they are necessarily disparaging Broadway's current capabilities.

50. It is likely that potential investors will be, and perhaps already have been, confused and misled as to Broadway's investment success and abilities and as to those of Klein and Britton, and it is likely that Broadway will be, or has already been, harmed by such confusion, in that potential investors may choose not to invest their capital with Broadway.

51. In their solicitation of business, Britton and Klein have relied upon and used information about the details of Broadway investments that they obtained when employed by Broadway. This information that is highly proprietary and confidential, such as the financial details of Broadway's investments, and is information that Broadway takes pains to keep confidential (as does every investment firm).

## FIRST CLAIM FOR RELIEF
(Declaratory Judgment)

52. Paragraphs 1 - 51 are incorporated fully herein.

53. A dispute has arisen between Broadway and Klein, and between Broadway and Britton, as to whether Klein and Britton are members of, or have any membership interest in, Broadway Real Estate Partners, LLC.

54. A dispute has arisen between Broadway and Britton as to whether their relationship is governed by the original Britton Agreement or by the Modified Britton Agreement.

55. A dispute has arisen between Broadway and Klein, and between Broadway and Britton, as to whether Klein and Britton are owed any moneys under their respective employment agreements.

11

56.     A real, immediate and substantial controversy exists between the parties as to

their legal rights and relations in respect of the above disputes.

### SECOND CLAIM FOR RELIEF
(Unfair Competition under the Lanham Act)

57.     Paragraph 1 - 56 are incorporated fully herein.

58.     Defendants have set up, or are attempting to set up, a competing business to

Broadway.

59.     Broadway's business, as well as defendants', is in interstate commerce.

60.     Defendants have made false and misleading representations of fact in connection

with promoting their services to potential investors.

61.     These representations are likely to cause confusion or mistake or to deceive

potential investors as to the affiliation, connection, or association of defendants with Broadway.

62.     These representations are made as part of commercial promotion, i.e., they are

part of an organized campaign on the part of defendants to promote their services to the relevant

market of potential investors.

63.     These representations misrepresent the nature, characteristics, or qualities of both

defendants' services and those of Broadway.

64.     Broadway has been, or is likely to be, harmed by defendant's misrepresentations.

### THIRD CLAIM FOR RELIEF
(Common-Law Unfair Competition)

65.     Paragraphs 1 - 64 are incorporated fully herein.

66.     Broadway's past investment success has created a reputation and goodwill among

potential investors that is highly valuable to Broadway.

12

67.    By misrepresenting to potential investors that they are responsible for that past success, defendants are attempting to misappropriate the goodwill and reputation that Broadway enjoys in the marketplace.

68.    Defendants have also misappropriated confidential and proprietary information obtained by them in their relationship as officers and employees of Broadway and are using that information to compete with Broadway.

69.    These misrepresentations and use of proprietary information have been done by defendants in bad faith.

70.    As a result of these actions, potential investors are likely to be confused or to be deceived as to the quality of both defendants' and Broadway's businesses.

71.    As a result of this confusion, Broadway has been, or is likely to be, damaged.

### FOURTH CLAIM FOR RELIEF
(Conditional Claim; Breach of Fiduciary Duty)

72.    Paragraphs 1 - 71, with the exception of paragraphs 29 and 34, are incorporated herein.

73.    This claim is conditioned upon the determination, contrary to Plaintiff's position, that either or both of Klein or Britton is a member of Broadway.

74.    If either Klein or Britton is a member of Broadway, then he has fiduciary duties to Broadway.

75.    Klein's and Britton's departures from Broadway were timed to create the most significant possible disruption to Broadway's ability to close the Funds.

76.    Klein and Britton failed, or refused, to mitigate this disruption by speaking to at least one potential investor who asked to talk with them. This investor withdrew at least $17 million in investment from Broadway.

77.     These actions or omissions by Klein and Britton were either intentional, willful misconduct or were grossly negligent.

78.     As a result of these actions or omissions by Klein and Britton, Broadway was damaged in an amount to be determined at trial, but believed to be at least $6 million.

WHEREFORE, plaintiff Broadway Real Estate Partners, LLC respectfully prays for a judgment of this Court:

a.      Declaring the rights and other legal relations of the plaintiff and defendants with respect to their interests in Broadway and also with respect to the employment agreements between Broadway and the defendants, and specifically declaring that

1. Klein is not a member of Broadway, and he has no membership interest in Broadway;

2. Britton is not a member of Broadway, and he has no membership interest in Broadway;

3. The employment relationship between Broadway and Klein is governed solely by the Klein Agreement;

4. The employment relationship between Broadway and Britton is governed solely by the Modified Britton Agreement;

5. Klein has breached the noncompete provisions of the Klein Agreement;

6. Britton has breached the noncompete provisions of the Modified Britton Agreement;

7. Klein is owed no further moneys from Broadway; and

8. Britton is owed no further moneys from Broadway.

b.      Permanently enjoining defendants from misrepresenting their performance as

employees of Broadway and from disclosing to any third party any proprietary information of

Broadway, including but not limited to the financial details of any Broadway investment;

c.      Awarding damages in an amount to be determined at trial;

d.      Awarding plaintiff the costs of this action, including attorneys' fees; and

e.      Awarding such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        October 14, 2005                    ZUKERMAN GORE & BRANDEIS, LLP

By:_____
    John K. Crossman (JC 7387)
    875 Third Avenue
    New York, New York 10022
    212.223.6700

    *Attorneys for Plaintiff*

**EXHIBIT A**

**BROADWAY REAL ESTATE PARTNERS LLC**
**TWO PICKWICK PLAZA, SUITE 420**
**GREENWICH, CT 06830**
**203 983 6299**

To:        Dean Britton

From:     Scott Lawlor

Date:     October 21, 2003

Re:        Agreement between Dean Britton and Broadway Real Estate Partners LLC
           (the "Company")

The attached Exhibit A reflects the terms of your agreement with the Company. The
exhibit outlines the full terms of your agreement and prevails over any previous verbal or
written agreements that may have existed between you and me or you and the Company.
This memo is intended to verify the arrangement between you and the Company and by
execution below, the parties confirm their agreement with the attached. In addition, it is
the intention of the parties to admit you into the Company LLC, based on terms and
conditions outlined in the attached, no later than December 31, 2004.

DEAN BRITTON                                       10/21/03
                                                   DATE

SCOTT LAWLOR                                       10/21/03
BROADWAY REAL ESTATE PARTNERS LLC                  DATE

# EXHIBIT A

**1 Title**

Chief Financial Officer ("DB")

**2 Job Description**

DB to be responsible for:
- identifying new capital partners
- oversight of all capital transactions (debt and equity, asset and entity-level, transactional and fund);
- developing new asset-level and entity-level capitalization strategies

**3 Start Date**

February 1, 2003

**4 Annual Compensation**

base salary of $125,000 plus participation in discretionary annual bonus pool
( annual bonus pool = up to 25% of earnings; Managing Member's participation not to exceed Managing Member's Economic % Interest)

**5 Economic % Interest ("Interest")**

15.44%, subject to vesting schedule

**6 Vesting**

50% at start date, 12.5% on 2/1/04 and 12.5% each 90 days thereafter until full vesting

**7 Cash Flow; Distributions**

defined as net operating earnings, inclusive of all fees, promotes and return of capital, less all all operating expenses; participation based on vested Interest;
(with respect to the sale of 400 Atlantic St., DB participation will be calculated as if fully vested); where appropriate, distributions to be structured in order to achieve capital gains treatment

**8 Dilution**

Interest to be increased or decreased pro rata, based on Interests granted
to new members or Interests returned to the Company by exiting members

**9 Capital Calls; Guarantees**

pro rata participation; to the extent guarantees have been or will be given, then the Company (and/or, as appropriate, other Members or employees) will execute a contribution agreement to achieve pro rata "true up"; in the event of an involuntary termination, not for cause, the Company (and/or, as appropriate, other Members or employees) will indemnify DB with respect to any personal liabilities

**10 Termination**

at any time, with or without cause, at the discretion of DB or the Company

**11 Exit Terms**

upon termination, DB and the Company to execute a participation agreement; the terms of the participation agreement will provide for payment, upon receipt by the Company, to DB of the Exit % of DB's vested interest in the promotes and capital accounts on deals closed at the time of termination for involuntary termination and 50% of the Exit % in the case of voluntary termination; in the case of fraud or willful malfeasance, the participation agreement will offset damages as a result of these acts;
the Exit % is to be calculated as follows: for each investment owned by the Company
at the time of termination, DB vested % Interest x (DB years at the Company during
the term of the investment/the total term of the investment)

# EXHIBIT A

**12 Noncompete**

for 18 months after the termination date, DB may not have any contact with any investor in any Company investment, attempt to recruit any Company employee or pursue any investment identified by the Company at the time of termination; violation of the Noncompete results in forfeiture of the participation agreement

**13 Change of Control; Sale of Company**

to the extent the result of any event is that Scott Lawlor no longer maintains decision-making control of the Company, then all interests vest immediately;

all sales of Company Interests to be offered parri passu to all Interest holders

**EXHIBIT B**

**BROADWAY REAL ESTATE PARTNERS LLC**
**TWO PICKWICK PLAZA, SUITE 420**
**GREENWICH, CT 06830**
**203 983 6299**

To:        Steve Klein

From:     Scott Lawlor

Date:     October 24, 2003

Re:        Agreement between Steve Klein and Broadway Real Estate Partners LLC
             (the "Company")

---

The attached Exhibit A reflects the terms of your agreement with the Company. The
exhibit outlines the full terms of your agreement and prevails over any previous verbal or
written agreements that may have existed between you and me or you and the Company.
This memo is intended to verify the arrangement between you and the Company and by
execution below, the parties confirm their agreement with the attached. In addition, it is
the intention of the parties to admit you into the Company LLC, based on terms and
conditions outlined in the attached, no later than December 31, 2004.

STEVE KLEIN                                    DATE

SCOTT LAWLOR                                DATE
BROADWAY REAL ESTATE PARTNERS LLC

## EXHIBIT A

**1 Title**

Chief Investment Officer ("SK"); subject to change based on product and/or geographic expansion

**2 Job Description**

SK to be responsible for:
- identifying new investment opportunities
- oversight of acquisition transactions

**3 Start Date**

November 1, 2002

**4 Annual Compensation**

base salary of $125,000 plus participation in discretionary annual bonus pool
( annual bonus pool = up to 25% of earnings; Managing Member's participation not to exceed Managing Member's Economic % Interest)

**5 Economic % Interest ("Interest")**

7.72%, subject to vesting schedule

**6 Vesting**

50% at start, 12.5% on 11/1/03 and 12.5% each 90 days thereafter until full vesting

**7 Cash Flow; Distributions**

defined as net operating earnings, inclusive of all fees, promotes and return of capital, less all operating expenses; participation based on vested Interest;
distributions to be structured in order to achieve capital gains treatment where appropriate.

**8 Dilution**

Interest to be increased or decreased pro rata, based on Interests granted to new members or Interests returned to the Company by exiting members

**9 Capital Calls; Guarantees**

pro rata participation; to the extent guarantees have been or will be given, then the Company (and/or, as appropriate, other Members or employees) will execute a contribution agreement to achieve pro rata "true up"; in the event of an involuntary termination, not for cause, the Company (and/or, as appropriate, other Members or employees) will indemnify SK with respect to any personal liabilities

**10 Termination**

at any time, with or without cause, at the discretion of SK or the Company

**11 Exit Terms**

upon termination, SK and the Company to execute a participation agreement; the terms of the participation agreement will provide for payment, upon receipt by the Company, to SK of the Exit % of SK's vested interest in the promotes and capital accounts on deals closed at the time of termination for involuntary termination and 67% of the Exit % in the case of voluntary termination; in the case of fraud or willful malfeasance, the participation agreement will offset damages as a result of these acts;
the Exit % is to be calculated as follows: for each investment owned by the Company the Exit % is to be calculated as follows: SK vested % Interest x (SK years at the Company during at the time of termination, SK vested % Interest x (SK years at the Company during the term of the investment/the total term of the investment)

Case 1:05-cv-09751-GEL   Document 3   Filed 12/12/05   Page 23 of 23

EXHIBIT A

12 Noncompete

for 18 months after the termination date, SK may not have any contact, for the purposes of real estate investment, with any investor in any Company investment, attempt to recruit any Company employee or pursue any investment identified by the Company at the time of termination; violation of the Noncompete results in forfeiture of the participation agreement

13 Change of Control; Sale of Company

to the extent the result of any event is that Scott Lawlor no longer maintains decision-making control of the Company, then all interests vest immediately;

all sales of Company interests to be offered parri passu to all Interest holders